**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-02030-STV

K.S.,[1]

     Plaintiff,

v.

DR. KILOLO KIJAKAZI,[2] Acting Commissioner of Social Security,

     Defendant.

_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

     This matter is before the Court on Plaintiff K.S.'s Complaint seeking review of the Commissioner of Social Security's decision denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 401 *et seq.*, and 1381-83c, respectively.  [#1]  The parties have both consented to proceed before this Court for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2.   [*See* #15]    The Court has jurisdiction to review the

---

[1] Pursuant to D.C.COLO.LAPR 5.2(b), "[a]n order resolving a social security appeal on the merits shall identify the plaintiff by initials only."

[2] Andrew M. Saul is the named Defendant in the Complaint as he was the Commissioner of Social Security at the time the Complaint was filed. [#1]  Dr. Kilolo Kijakazi is currently serving as the Acting Commissioner of the Social Security Administration.   *See* https://www.ssa.gov/agency/commissioner (last accessed on February 25, 2022).  Pursuant to Federal Rule of Civil Procedure 25(d), Dr. Kijakazi, as Andrew M. Saul's successor, "is automatically substituted as a party."  *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This Court has carefully considered the Complaint [#1], the Social Security Administrative Record [#14], the parties' briefing [##18, 23], and the applicable case law, and has determined that oral argument would not materially assist in the disposition of this appeal. For the following reasons, the Court **REVERSES** the Commissioner's decision.

## I. LEGAL STANDARD

### A. Five-Step Process for Determining Disability

The SSA defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[3] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "This twelve-month duration requirement applies to the claimant's inability to engage in any substantial gainful activity, and not just his underlying impairment." *Lax*, 489 F.3d at 1084. "In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility . . ., the Commissioner [ ] shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

---

[3] "Substantial gainful activity" is defined in the regulations as "work that (a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, 416.910; *see also* 20 C.F.R. §§ 404.1572, 416.972.

"The Commissioner is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled."  *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005).  The five-step inquiry is as follows:

1. The Commissioner first determines whether the claimant's work activity, if any, constitutes substantial gainful activity;

2. If not, the Commissioner then considers the medical severity of the claimant's mental and physical impairments to determine whether any impairment or combination of impairments is "severe;"[4]

3. If so, the Commissioner then must consider whether any of the severe impairment(s) meet or exceed a listed impairment in the appendix of the regulations;

4. If not, the Commissioner next must determine whether the claimant's residual functional capacity ("RFC")—*i.e.*, the functional capacity the claimant retains despite his impairments—is sufficient to allow the claimant to perform his past relevant work, if any;

5. If not, the Commissioner finally must determine whether the claimant's RFC, age, education and work experience are sufficient to permit the claimant to perform other work in the national economy.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *Bailey v. Berryhill*, 250 F. Supp. 3d 782, 784 (D. Colo. 2017). The claimant bears the burden of establishing a *prima facie* case of disability at steps one through four, after which the burden shifts to the Commissioner at step five to show that the claimant retains the ability to perform work in the national economy.  *Wells v. Colvin*, 727 F.3d 1061, 1064 n.1 (10th Cir. 2013); *Lax*, 489 F.3d at 1084.  "A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Ryan v. Colvin*, 214 F. Supp. 3d 1015, 1018 (D. Colo.

---

[4] The regulations define severe impairment as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).

2016) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991)).

    **B.**    **Standard of Review**

    In reviewing the Commissioner's decision, the Court's review is limited to a determination of "whether the Commissioner applied the correct legal standards and whether her factual findings are supported by substantial evidence." *Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017) (citing *Nguyen v. Shalala*, 43 F.3d 1400, 1402 (10th Cir. 1994)). "With regard to the law, reversal may be appropriate when [the Commissioner] either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards." *Bailey*, 250 F. Supp. 3d at 784 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).

    "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). "It requires more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax*, 489 F.3d at 1084). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Grogan*, 399 F.3d at 1261-62 (quoting *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992)). The Court must "meticulously examine the record as a whole, including anything that may

undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met.'" *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (quotation omitted).  The Court, however, "will not reweigh the evidence or substitute [its] judgment for the Commissioner's."  *Hackett*, 395 F.3d at 1172.

## II.  BACKGROUND

Plaintiff was born in 1979.  [AR 202][5]  Plaintiff completed two years of college and has a nursing degree.  [AR 42, 230, 608]  She can communicate in English.  [AR 40-72, 228]  On or about October 24, 2017, Plaintiff filed a Title II application for DIB and a Title XVI application for SSI.  [AR 201-13]  Plaintiff claims a disability onset date of June 24, 2016, thus Plaintiff was 36 years old at the time of the alleged onset.  [AR 202, 204]  Plaintiff claims disability based upon uncontrollable epilepsy, back pain, depression, post-traumatic stress disorder ("PTSD"), anxiety, and headaches.  [AR 229] Plaintiff worked in a variety of positions prior to the alleged disability onset date, including a home healthcare nurse, an office manager in a doctor's office, and a travel coordinator for an engineering firm.  [AR 230]  Most recently, Plaintiff was a customer service worker for a tax preparation business, which she did until January 2016.  [*Id.*] Plaintiff has not engaged in substantial gainful activity since June 24, 2016, the alleged onset date.  [AR 18]

### A.  Medical Background

Plaintiff suffers from a variety of physical and mental ailments.  She suffers from a seizure disorder.  [AR 319]  Plaintiff suffered her first grand mal seizure on or about May 27, 2016.  [AR 319, 543, 867, 1169]  The onset was sudden, though Plaintiff had

---

[5]  All references to "AR" refer to the sequentially numbered Social Security Administrative Record filed in this case.  [#14]

been having "spells" for at least a year before the seizure and an olfactory aura (in which she smelled a burning smell) for at least six months before the seizure.  [AR 320, 543, 867]

On July 1, 2016, Plaintiff went to the hospital complaining of headache, memory loss, and confusion, and said she "fe[lt] another seizure coming on."  [AR 319]  She explained that she had suffered a second seizure two nights earlier during which she had pain on the left side of her temple area.  [AR 319-20]  She reported hearing noises and seeing lights during the episode.  [AR 320]  During the visit, Plaintiff was alert and coherent, and was not in any apparent distress.  [AR 319-20]  An MRI of her brain revealed white matter changes but no acute intracranial process.  [AR 330]  Plaintiff was diagnosed with probable seizure disorder, was prescribed Keppra, given a referral to a neurologist, and instructed not to drive, swim, operate machinery, or engage in any other activity that could put her at risk if she had a seizure.  [AR 326]  During a follow-up visit it was noted that Plaintiff had been taking heavy doses of Alprazolam for a number of years to treat PTSD and depression, and that both her seizures had occurred after she had missed doses.  [AR 348, 350]  An EEG revealed "mild dysrh[y]thmia with theta wave activity in the L temporal area of the brain."  [AR 348]

At a consultation with a neurologist, Dr. Collier, on September 19, 2016, Plaintiff reported that her last generalized seizure was in July 2016, but that she had a "spell" about a week earlier.  [AR 542-43]  Plaintiff reported that she had only taken three doses of the Keppra, because she could not tolerate it.  [*Id.*]  It was noted that Plaintiff was in no acute distress at the time and was cooperative and had normal cognitive functioning.  [AR 544]  Plaintiff was diagnosed with partial symptomatic epilepsy with

complex partial seizures, not intractable, without status epilepticus and was prescribed Lamictal and instructed regarding appropriate seizure safety, including restrictions on driving, heights, water, and cooking.  [AR 545]

On October 19, 2016, Plaintiff called Dr. Collier's office to report that she had blacked out the day before and woke up with blood on her face from a bitten tongue and lip; Dr. Collier ordered an EEG for Plaintiff.  [AR 542]  On October 25, 2016, Plaintiff had an extended multi-channel EEG.   [AR 541-42]   The EEG revealed generalized epileptiform discharges more pronounced during photic stimulation.  [AR 542]  The EEG was also notable for excess beta activity.  [*Id*.]  "The epileptiform activity on the EEG suggest[ed] a generalized seizure disorder such as primary generalized epilepsy."  [*Id*.] On November 1, 2016, Plaintiff had an appointment with Dr. Collier to discuss the EEG results.   [AR 538-40]   Plaintiff reported that she had a generalized seizure as her husband drove her to the testing center for the EEG.  [AR 539]  During the seizure, Plaintiff became unresponsive for about one minute, which was followed by postictal confusion for about five to ten minutes.  [*Id*.]  Plaintiff reported that she was tolerating the Lamictal—which had not yet reached a therapeutic level—well and had not had any further seizure activity.   [AR 539]   Based upon the EEG, Dr. Collier concluded that Plaintiff "[c]learly . . . does have a photosensitivity component to her seizures" and "recommended . . . that [Plaintiff] avoid flashing lights."  [AR 540]  Dr. Collier continued the uptitration of Lamictal, discussed seizure safety precautions, and scheduled a follow-up in three months.  [*Id*.]

Plaintiff reported a big seizure on December 14, 2016 and medical notes from January 2017 indicate that Plaintiff was continuing to experience breakthrough seizures.

[AR 531, 534, 539, 542]  Following the seizures, Plaintiff suffered confusion.  [AR 531, 535]  At a follow-up appointment on January 19, 2017, Plaintiff reported that she had a seizure on January 15, 2017 but that she felt that she was "doing incredibly well on Lamictal" and that it was "helping control her seizures."  [AR 531]  The record notes that Plaintiff appeared to have a catamenial pattern to her seizures.  [*Id.*]  At a neurology follow-up on March 21, 2017, Plaintiff reported that she had "a couple of visual auras" a few days prior and was continued on the Lamictal.  [AR 501]  At an appointment on April 12, 2017, Plaintiff reported that she had not had a seizure in three months [AR 499].

On July 18, 2017, Plaintiff called Dr. Collier's office and reported that she was having lots of auras and didn't know whether she was having seizures.  [AR 491]  At a follow-up with Dr. Collier on August 2, 2017, Plaintiff reported that she was "having events of constant auras" in which she smelled a constant burning smell.  [AR 489]  Plaintiff further reported that her husband had seen Plaintiff experience episodes of blanking out.  [*Id.*]  Plaintiff reported dizziness and coordination problems, as well as having issues with her memory.  [*Id.*]  Dr. Collier noted that Plaintiff was "continuing to have frequent breakthrough seizures and strong aura."  [AR 490]  At a follow-up with Dr. Collier on September 5, 2017, Plaintiff reported that she was continuing to experience "silent seizures" and "partial seizures" that caused her to "lock up," with the last seizure occurring on August 27, 2017.  [AR 485]  Plaintiff reported that she had used the intranasal Versed "rescue medication" twice since her last appointment.  [*Id.*]  Dr. Collier continued Plaintiff on the Lamictal, prescribed more intranasal Versed for seizures lasting greater than five minutes or clusters of three seizures in less than fifteen minutes

without a return to baseline, and referred Plaintiff for continuous long-term monitoring for epileptic seizures.  [AR 487]

In an October 2, 2017 seizure questionnaire completed as part of her disability application, Plaintiff indicated that she had two major seizures per month, with the most recent occurring in August 2017, and two to three minor seizures per week, with the most recent occurring on September 28, 2017.  [AR 278]  At a follow-up with Dr. Collier on November 6, 2017, Plaintiff stated that she believed she was "improving somewhat relatively speaking" since her last appointment.  [AR 481]  Plaintiff reported that she continued to experience approximately one strong aura per week and was having a "silent seizure" approximately every two weeks, but had not had to use the rescue medication since her last visit.  [*Id.*]  Notes from the visit indicate that Plaintiff had seen "significant improvement in her symptoms" and, because Plaintiff's seizures were occurring with less frequency and regularity, Plaintiff had decided not to proceed with the continuous long-term monitoring in the epilepsy monitoring unit.  [*Id.*]

On December 11, 2017, Plaintiff called Dr. Collier's office seeking a prescription for the rescue mediation.  [AR 627]  When reminded that she had told Dr. Collier at her last appointment that the Lamictal seemed to be helping with her seizures, Plaintiff responded that she has not had a reduction in her seizures.  [*Id.*]  Plaintiff was told she then should do the continuous long-term monitoring.  [*Id.*]  On December 15, 2017, Plaintiff called Dr. Collier's office and stated that she was "having baby seizures and starring [sic] spells."  [AR 626]  On March 2, 2018, Plaintiff called to request a refill for the Versed, rescue medication.  [AR 626]  Plaintiff was told that, because she had not shown up for her last two appointments, Dr. Collier would not refill the prescription and

warned Plaintiff that she may be "fired from the clinic" if she fails to show up for another appointment.  [*Id.*]

At an appointment with Dr. Collier on March 28, 2018, Plaintiff stated that she "ha[d] not had a seizure for some time [but] may have had one 'petit mal' type of event in the past month."  [AR 624]  Plaintiff stated that she missed her medications for approximately two weeks in January, but did not have any seizures though she may have had "intermittent staring spells."  [*Id.*]  Plaintiff reported that she had not used the Versed for some time and threw away her remaining supply pursuant to instructions from her pharmacist.  [*Id.*]  Plaintiff mentioned that she had been going snowboarding.  [*Id.*]  Dr. Collier noted that Plaintiff's condition appeared to be "improving" and that she did not recommend further use of the Versed due to concerns about the potential for abuse.  [AR 625]

On November 15, 2018, Plaintiff went to Grand River Primary Care and saw a nurse practitioner in connection with a seizure she had two days earlier.  [AR 706]  Plaintiff stated that, as a result of the seizure, she had hit her head on the floor.  [*Id.*]  Plaintiff indicated that her stronger seizures were decreasing, but that she had petit mal seizures on occasion.  [*Id.*]  At a follow-up with Grand River Primary Care on December 6, 2018, Plaintiff reported that she had two seizures since her dosage of Lamictal was increased to 450 mg.  [AR 703]  The doctor stated in the report that he would increase the Lamictal and follow-up in three weeks.  [AR 705]  At a follow-up visit on January 18, 2019, Plaintiff reported that she had not had any seizures since she was placed on the higher dosage of Lamictal.  [AR 700]  On March 7, 2019, Plaintiff had an office visit

regarding her seizures.   [AR 1233]   Seizure disorder and difficulty falling or staying asleep were listed as active problems for Plaintiff.  [AR 1234]

In addition to epilepsy, Plaintiff also suffers from back pain.  On July 25, 2016, Plaintiff underwent a CT scan of the cervical spine following an incident where Plaintiff fell down the stairs after having been drinking.  [AR 307, 310]   The scan revealed mild reversal of the cervical lordosis, moderate narrowing of the C4-C5 disc, and mild narrowing of the C5-C6 disc.  [AR 307]   Mild degenerative endplate changes at those levels were also noted.  [AR 307-08]

On February 26, 2017, Plaintiff returned to the emergency room after suffering another fall down the stairs while intoxicated.   [AR 378-79, 509]   Plaintiff had a burst fracture of the T-10 vertebral body, T-10 fractures of the lamina and pedicle, associated injuries to the adjacent spinous processes and transverse processes, and mild retropulsion of the vertebral body fracture into the spinal canal.  [AR 378-79, 387]  A CT scan revealed degenerative disc disease at the C4-C5 and C5-C6 discs, unchanged from the earlier CT scan.  [AR 384]

On March 2, 2017, Plaintiff had back surgery during which doctors implanted a plate and six screws.  [AR 332, 507-09, 521-22]   During a March 21, 2017 follow-up visit, Plaintiff indicated that she had been active since the surgery, but was experiencing mild to moderate thoracic pain.  [AR 503]   The medical provider did not believe that the pain was unusual and reviewed images that showed stable alignment and instrumentation.   [AR 504]   On April 5, 2017, Plaintiff called her medical provider to inform them that she was in so much pain that she could neither move nor sleep.  [AR 500]   Plaintiff explained that she believed that she had "tweaked her back" the day

before.  [*Id.*]  An April 12, 2017 medical record noted tenderness at the incision point as well as sciatic nerve pain on the right side that radiated down Plaintiff's leg.  [AR 499] Plaintiff reported that her pain was slowly starting to improve, but stated that the hardware caused her discomfort.  [*Id.*]

On May 1, 2017, Plaintiff called her medical provider to report that she had "tweaked her back" on April 28, 2017, which resulted in renewed back pain.  [AR 497] During a May 10, 2017 medical appointment, Plaintiff reported pain on the right paraspinal area that radiated forward along her right rib.  [AR 495]  During a May 24, 2017 follow-up visit, Plaintiff stated that her right paraspinal and rib pain had resolved. [AR 492]  Plaintiff nonetheless stated that she was continuing to have bad muscle spasms which improved with muscle relaxants and lidocaine patches.  [*Id.*]

In May and June 2017, Plaintiff engaged in physical therapy.  [AR 353-377] Physical therapy notes indicated that Plaintiff presented with global weakness and functional limitations in self-care, home management, and work activities.  [*See, e.g.*, AR 354, 357, 361, 364]  The physical therapy records generally show Plaintiff making improvement and her pain decreasing with time.  [AR 353, 356, 360, 363, 366, 369, 375]  In fact, in June 2017, Plaintiff's pain was listed as a 0 out of 10 both before and after treatment.  [AR 353, 356]  The therapy records indicated that Plaintiff's prognosis was good and that the therapist expected that Plaintiff would have complete independence at home and work in eight weeks.  [AR 354, 357, 363]

Notes from an August 29, 2017 medical appointment reflect that Plaintiff was doing well.  [AR 488]  Plaintiff reported that she greatly benefitted from physical therapy and was able to do her regular activities without much adjustment or pain.  [*Id.*]  Plaintiff,

however, did report occasional rib pain and back stiffness.  [*Id.*]  Records from late 2017 and 2018 reveal occasional back pain, typically associated with physical activity.  [*See, e.g.*, AR 672, 685, 696]   At a May 2, 2018 medical appointment, Plaintiff reported chronic right side pain that was expected to resolve with hardware removal.  [AR 676]  A May 16, 2018 CT scan revealed no complications and intact hardware.  [AR 1198-99]

In addition to her epilepsy and back pain, Plaintiff also claimed disability due to her headaches.  [AR 229]  In the headache questionnaire completed with her disability application, Plaintiff claimed to suffer from migraines approximately three times per week.  [AR 280]  Plaintiff indicated that the migraines would last three to four hours.  [*Id.*]  Plaintiff's history of headaches is reflected in her medical records.  [*See, e.g.*, AR 489, 540, 543]

In addition to these physical ailments, Plaintiff also suffers from anxiety, insomnia, depression, and PTSD.  [*See, e.g.*, AR 297, 299, 424]  In July 2016, Plaintiff began receiving mental health treatment after having recently moved from Florida to Colorado.[6]  [AR 468]  Plaintiff reported trouble concentrating and relaxing, and noted that her mental health symptoms were sometimes difficult for her to control at home.  [AR 468-69]  Plaintiff denied suicidal ideation.  [AR 469]  Therapist records from August 2016 reflect Plaintiff continued to suffer from depression and anxiety.  [AR 1124]

Plaintiff was seen by mental health professionals on an emergency basis in September 2016, stemming from recently being diagnosed with epilepsy.  [AR 438]  Plaintiff expressed feelings of anxiety, depression and hopelessness, though she denied suicidal ideation.  [*Id.*]  Treatment records from December 2016 indicate that

_____

[6] Plaintiff had received previous treatment for depression and anxiety prior to the alleged onset date.  [*See*, *e.g.*, AR 468, 741, 745, 791]

Plaintiff continued to experience depression with feelings of hopelessness and fatigue, and difficulties sleeping.  [AR 448]  Plaintiff denied suicidal ideation.  [*Id.*]  The records further reflect that Plaintiff's insight was impaired but that there was "no evidence that [Plaintiff] [wa]s gravely disabled."  [AR 449]  During a November 2016 therapy session, Plaintiff stated that she was "feeling a lot better" [AR 1133], though December 2016 therapy records indicate that Plaintiff felt increased anxiety following another seizure [AR 1138].

Medical records from February 6, 2017, indicate that Plaintiff continued to suffer from anxiety.  [AR 338]  On March 10, 2017, Plaintiff reported feelings of hopelessness and fatigue to her therapist, but denied suicidal ideation.  [AR 453]  Plaintiff further indicated that her symptoms were "somewhat difficult to manage at home and with others."  [*Id.*]

In both June and July 2017, Plaintiff reported feeling depressed to her therapist. [AR 423, 458]  During her July visit, Plaintiff indicated that she "noticed little things happening like missing her children's doctor appointments and missing dates to get her benefit paperwork signed."  [AR 423]  Plaintiff also reported struggling with sobriety. [*Id.*]  Records from August 2017 reflect Plaintiff continued to struggle with depression. [AR 1178]

By September 2017, Plaintiff's depression appears to have intensified.  [AR 463] Plaintiff had recently had to kick her alcoholic father and her mother who had been diagnosed with cancer out of the house.  [AR 490]  During a September 7, 2017 meeting with her therapist, Plaintiff reported feeling depressed with feelings of hopelessness.  [AR 463]  She indicated that she was tired and had difficulties sleeping.

[*Id.*]  She also reported feelings of anxiety and an inability to control her worrying.  [*Id.*]  Nonetheless, she denied suicidal ideation.  [*Id.*]

Plaintiff continued to receive counseling from October 2017 through May 2018.  [AR 1112, 1158-67, 1186-97]   Records from January and March 2018 show that Plaintiff's mood and anxiety had improved with medication.  [AR 1112, 1158]  During a May 18, 2018 therapy session Plaintiff indicated that she was "feeling at peace."  [AR1163]   She was feeling less depressed and less anxious and denied suicidal ideation.  [*Id.*]

On August 28, 2018, Plaintiff was hospitalized after she intentionally cut her left wrist with a knife while intoxicated.  [AR 714-16]   According to Plaintiff's husband, Plaintiff was "hammered" and cut her wrist during an argument.  [AR 716]  The incident was sudden and Plaintiff did not make any homicidal or suicidal statements.  [*Id.*]  According to Plaintiff, her landlady accused Plaintiff of stealing from her, which upset Plaintiff and caused her to break her year-long sobriety.  [AR 1047-48]  Plaintiff stated that she cut herself in anger and that it was not a suicide attempt and Plaintiff was ultimately determined to be at low-risk of suicide.  [AR 1048-49]

Records from November 2018 reflect that Plaintiff continued to have feelings of depression and hopelessness, as well as anxiety.  [AR 1086]  She denied suicidal ideation or desire to harm herself.  [AR 1089]  During February and March 2019 therapy sessions Plaintiff rated her depression as a three out of ten and her anxiety as a four or five out of ten.  [AR 1063, 1065]  Plaintiff denied suicidal ideation.  [*Id.*]  During a March 2019 session Plaintiff complained of irritability and increased insomnia, the latter of which she attributed to the increase in her Lamictal.  [AR 1079]

**B.      Procedural History**

Plaintiff's applications for DIB and SSI were initially denied on May 1, 2018.  [AR 82, 84]  On May 25, 2018, Plaintiff filed a request for a hearing before an administrative law judge ("ALJ").  [AR 143-44]  A hearing was conducted before ALJ Kathleen Laub on May 2, 2019, where Plaintiff was represented by counsel.  [AR 37-81]  Plaintiff testified [AR 41-72], as did vocational expert ("VE") Cyndee Burnett [AR 73-80].

On July 9, 2019, the ALJ issued a decision denying Plaintiff benefits.  [AR 15-30]  Plaintiff timely requested a review of that decision by the Appeals Council [AR 198-200], which denied her request for review on May 12, 2020 [AR 1-6].  Plaintiff timely filed an appeal with this Court on July 12, 2020.  [#1]  Because the Appeals Council denied Plaintiff's request for review, the ALJ's decision is the final decision of the Commissioner for purposes of this appeal.  *See* 20 C.F.R. §§ 404.981, 416.1481, 422.210.

**C.      The ALJ's Decision**

The ALJ denied Plaintiff's applications for DIB and SSI after evaluating the evidence pursuant to the five-step sequential evaluation process.  [AR 15-30]  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since June 24, 2016, her alleged onset date.  [AR 18]  At step two, the ALJ found that Plaintiff had the following severe impairments: thoracic spine fracture-post T8-T12 posterior fusion surgery, generalized epilepsy, degenerative disc disease of the cervical spine, major depressive disorder, PTSD, and generalized anxiety disorder.  [*Id*.]  At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of

impairments that meets or medically equals the severity of one of the listed impairments in the appendix of the regulations.  [AR 19-21]

Following step three, the ALJ determined that Plaintiff retained the RFC to perform medium work with the following limitations:

> [Plaintiff] can never climb ladders, ropes, or scaffolds or tolerate exposure to hazards such as heavy mechanical machinery (like a jackhammer or tractor).  She cannot work around unprotected heights or be exposed to bodies of water.  She can perform work which needs some skills but does not require doing the more complex work duties.  She can persist at tasks that can be learned in up to three months on the job.  She can sustain ordinary routines, understand, carry out and remember instructions and use judgment in making work related decisions.  She can attend and concentrate for extended periods totaling a normal eight-hour workday with usual work breaks.  She can respond appropriately to supervision, co-workers and usual work situations.  She can deal with changes in a routine work setting.  She can tolerate occasional interaction with supervisors and co-workers and brief superficial interaction with the general public on less than occasional basis.  She should not have to engage in any teamwork or collaboration with co-workers.  She can tolerate occasional changes in work duties and tasks.  She is limited to low stress work, which is defined as work requiring at most occasional decisions and occasional changes in work duties and tasks.

[AR 21]   The ALJ provided a narrative setting forth evidence from the record and medical opinions considered in determining the RFC.  [AR 21-27]

At step four, the ALJ found that Plaintiff was unable to perform any past relevant work.  [AR 28]  Finally, at step five, the ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  [AR 29]  Specifically, the ALJ agreed with the VE's testimony opining that Plaintiff could perform the following representative occupations: dishwasher, laundry worker, and assembler of printed circuit boards.  [*Id.*] Accordingly, the ALJ determined that Plaintiff was not under a disability from June 24,

2016 (the alleged onset date) through July 12, 2019 (the date of the ALJ's decision).
[AR 30]

## III.   ANALYSIS

Plaintiff raises two challenges to the ALJ's decision on appeal.   First, Plaintiff contends that the ALJ erred in evaluating Plaintiff's subjective account of her symptoms and limitations.   [#18 at 5-11]   Second, Plaintiff maintains that the ALJ failed to correct the VE's testimony, which conflicted with the Dictionary of Occupational Titles ("DOT"), and then relied upon that errant testimony to determine that Plaintiff was not disabled. [*Id.* at 11-13]   The Court addresses each of these arguments in turn.

### A.   The ALJ's Evaluation of Plaintiff's Subjective Account of Her Symptoms

Plaintiff first argues that the ALJ erred in evaluating Plaintiff's subjective account of her symptoms and limitations related to her seizures.   [*Id.* at 5-11]   As noted above, as part of the analysis at step four, the Commissioner must determine the claimant's RFC—the functional capacity the claimant retains despite her impairments.   *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Grogan*, 399 F.3d at 1261; *Bailey*, 250 F. Supp. 3d at 784.   Social Security Ruling ("SSR") 16-3p dictates a two-step process for the ALJ to analyze an applicant's own description or statement of his or her physical or mental limitations.[7]   SSR 16-3p, 2016 WL 1119029, at *3 (S.S.A. Mar. 16, 2016).   First,

---

[7] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p by "eliminating the use of the term 'credibility,'" to "clarify that subjective symptom evaluation" is not a character evaluation.   *Parker v. Berryhill*, No. 16-cv-2378-WJM, 2017 WL 3315625, at *4 n.7  (D. Colo. Aug. 3, 2017) (quoting SSR 16-3p, 2016 WL 1119029, at *1 (S.S.A. Mar. 16, 2016)); *see also* SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996).   Here, because Plaintiff filed her applications for disability benefits in October 2017 [AR 201-13] and the ALJ's decision was issued on July 9, 2019 [AR 15-30], SSR 16-3p applies.   *See* SSR 16-3p, 2016 WL 1237954, at *1 (clarifying that the effective date of SSR 16-3p is March

the ALJ determines whether the claimant has a medically determinable impairment ("MDI") that could reasonably be expected to produce the claimant's symptoms.  *Id.*  Second, the ALJ "evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the individual's ability to perform work-related activities."  *Id.*  As part of that analysis, the ALJ should consider the following factors:

(i)     Daily activities;
(ii)    The location, duration, frequency, and intensity of pain or other symptoms;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
(v)     Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
(vi)    Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on back, standing for 15 to 20 minutes every hour, sleeping on a board); and
(vii)   Other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p, 2016 WL 1119029, at *7.  "[A]n ALJ need not engage in 'a formalistic factor-by-factor recitation of the evidence'; as 'long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's [symptoms]."  *Tuttle v. Comm'r, SSA*, 853 F. App'x 246, 251 (10th Cir. 2021) (quoting *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)).

---

28, 2016).  The analysis under SSR 16-3p, however, "remains substantially the same" as under SSR 96-7p.  *Olson v. Comm'r, SSA*, 843 F. App'x 93, 97 n.3 (10th Cir. 2021); *see also Watts v. Berryhill*, 705 F. App'x 759, 763 n.4 (10th Cir. 2017) ("[T]he factors to be considered under SSR 96-7p are the same as under SSR 16-3p.").  "Older authorities that addressed a claimant's 'credibility'" under SSR 96-7p thus remain relevant to the Court's application of SSR 16-3p, but those authorities are "construed as referring to an individual's subjective symptom evidence" rather than credibility. *Maldonado v. Kijakazi*,  No. 1:20-CV-01119-KRS, 2022 WL 425009, at *3 n.1 (D.N.M. Feb. 11, 2022).

In evaluating the intensity and persistence of a claimant's symptoms, the ALJ must consider "all of the available evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). The regulations acknowledge that "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ thus must evaluate the claimant's statements about their symptoms "in relation to the objective medical evidence" *and* all of the other evidence in the record. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); *see also Thomas v. Berryhill*, 685 F. App'x 659, 664 (10th Cir. 2017) (finding that ALJ had sufficiently "consider[ed] all the evidence, both objective and subjective" in finding that the claimant's pain was not disabling (quotation omitted)). Determinations regarding the weight to be given to a claimant's own testimony regarding the severity of their symptoms "are peculiarly the province of the finder of fact, and [the Court] will not upset such determinations when supported by substantial evidence." *Brownrigg v. Berryhill*, 688 F. App'x 542, 546 (10th Cir. 2017) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)). Such determinations, however, "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler*, 68 F.3d at 391 (quotation omitted).

Here, the ALJ described Plaintiff's testimony regarding her seizure-related symptoms as follows:

> [Plaintiff] testified that physical and mental impairments prevent her from being able to work on a consistent and full-time basis. Her core allegation is the recurrent and unpredictable seizures result in physical and mental fatigue such that she cannot perform consistent work activity. She testified to a history of grand mal seizures, but that such seizures have been controlled with the use of prescription medication. However, she described anti-seizure medication side effects such as insomnia and nausea. She testified that she has non-grand mal seizures approximately

20

five times per month, which are relatively short in duration but result in residual physical and mental fatigue and headaches.  She explained that due to the unpredictable nature of the seizures, she needs to be supervised when performing tasks such as bathing and cooking.

[AR 22]  In considering this testimony, the ALJ concluded:  "After careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  [*Id.*]  Although the ALJ then identified several examples of alleged inconsistencies between Plaintiff's testimony regarding her seizure-related symptoms and the record evidence, the Court finds that several of the specific examples relied upon by the ALJ are not supported by substantial evidence.

Most significantly, the ALJ contended that "[p]hysically, while the [Plaintiff] has been diagnosed with epilepsy with a history of grand mal seizures, as explained above, the claimant's seizure symptoms are largely controlled with medication."[8]  [AR 25]  The

---

[8] The ALJ also found that Plaintiff's report at a February 2018 psychiatric consultative examination that she had been sleeping six to eight hours per night was "inconsistent with the claimant's allegation of extreme insomnia secondary to anti-seizure mediation side effects."  [AR 25]  The ALJ fails to acknowledge other medical records indicating that Plaintiff had difficulty sleeping.  [*See, e.g.*, AR448, 490, 1065]  As the regulations acknowledge, "[s]ymptoms may vary in their intensity, persistence, and functional effects."  SSR 16-3p, 2016 WL 1119029, at *8.  Nor does the ALJ's consideration of Plaintiff's insomnia appear to consider that Plaintiff's dosage of the seizure medication increased over time; Plaintiff testified that after her dosage was increased in November 2018, it helped with the seizures but Plaintiff "wasn't sleeping for days" and would only get two or three hours of sleep.  [AR 61]  Medical records from March 2019 indicate that Plaintiff complained of insomnia.  [AR 1065, 1233-34]  Similarly, the ALJ emphasized that Plaintiff "repeatedly exhibited normal neurological functioning during the relevant period, including normal strength and muscle mass in her extremities with intact reflexes, coordination and sensation" [AR 23; *see also* AR 25], but the ALJ fails to

ALJ does not cite to any specific evidence in support of this statement, but appears to refer to the ALJ's prior summary of the medical record in which the ALJ stated:

> [T]he longitudinal medical record indicates that [Plaintiff's] seizures were largely controlled with medication.  In August 2017, [Plaintiff] reported continued "silent" seizures.   Treatment notes from November 2017 documents "significant improvement" of seizure symptoms with medication; [Plaintiff] reported a "silent" seizure about once every two weeks.  Again, objective findings related to the [Plaintiff's] neurological functioning was consistently normal.   Subsequent treatment notes document instances where the [Plaintiff] denied appreciable seizure reoccurrence.  Recent treatment notes from January 2019 documents [Plaintiff] denying all seizures with a higher dose of Lamictal.

[AR 23-24 (citations omitted)]   The Court finds that the ALJ's conclusion that "the longitudinal medical record indicates that [Plaintiff's] seizures were largely controlled with medication" is not supported by substantial evidence.[9]   Although "the ALJ's

---

explain how these findings are inconsistent with Plaintiff's subjective description of her symptoms given that these findings were made at doctor's appointments when Plaintiff was not suffering from a seizure.  In their response brief, the Commissioner contends that "[e]ven when Plaintiff arrived at the hospital immediately following a seizure, examination findings were normal."  [#23 at 7]  The ALJ, however, did not expressly offer this as a justification for her reliance on the normal examination findings, and the Court "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself."  *Haga v. Astrue*, 482 F.3d 1205, 1207–08 (10th Cir. 2007).

[9] Seemingly as a result of the ALJ's conclusion that Plaintiff's seizures were largely controlled with medication, the ALJ included in the RFC only limitations preventing Plaintiff from performing hazardous activities "as safety precautions in the event of seizure recurrence."  [AR 24]  The hypotheticals the ALJ provided to the VE thus also only included these limitations on hazardous activities and did not include any specific information about the seizures Plaintiff experiences as a result of her seizure disorder.  [*See* AR 76-79]  Courts, including the Tenth Circuit in an unpublished decision, have held that "[t]he omission of any specific information about [the claimant's] seizures from the ALJ's hypothetical questions—such as potential frequency, type of seizure activity, and any post-ictal effects found by the ALJ—undermines the VE's testimony about jobs potentially available to [the claimant] and the ALJ's determination that she can engage in substantial gainful activity despite her seizure disorder."  *Tucker v. Barnhart*, 201 F. App'x 617, 624 (10th Cir. 2006); *see also Griffin v. Astrue*, No. 2:11-CV-192, 2012 WL 725694, at *12 (S.D. Ohio Mar. 5, 2012) (collecting cases), *report and recommendation adopted*, 2012 WL 1354034 (S.D. Ohio Apr. 18, 2012).  On remand, the ALJ should consider including in any hypothetical posed to the VE specific information about

rationale is facially reasonable, the Court finds that it improperly focuses on a selective portion of the medical records, while ignoring other evidence indicating that Plaintiff is more limited." *Debra W. v. Kijakazi*, No. 19-CV-644-CDL, 2021 WL 3931938, at *5 (N.D. Okla. Sept. 2, 2021).   The ALJ describes an August 2017 medical record as reporting only "continued 'silent' seizures," but the medical record indicates that Plaintiff "is continuing to have frequent breakthrough seizures and strong aura" and Plaintiff reported "events of constant auras" and "episodes of blanking out."   [AR 489-90] Although records from November 2017 do indicate "significant improvement" and "a 'silent' seizure" every two weeks, the record also indicates that Plaintiff was still having "about 1 strong aura" per week and that she was "improving *somewhat relatively speaking*."   [AR 481 (emphasis added)]   The ALJ does not reference a medical record from December 2017 reflecting that Plaintiff called to report that she was confused and "having baby seizures and starring [sic] spells."   [AR 626]   Although the ALJ cites a treatment note from March 2018 reflecting that Plaintiff had not had a seizure for some time, that same treatment note indicates that Plaintiff continued to have "intermittent staring spells" and may have had a "petit mal" type of event in the past month.  [AR 624]

Most problematic, in supporting her conclusion that the longitudinal record indicates that Plaintiff's seizures are largely controlled by medication, the ALJ makes no reference to the fact that Plaintiff had a significant grand mal seizure in November 2018 that resulted in Plaintiff's dosage of Lamictal being increased.[10]  [*See* AR 60-61, 703,

---

Plaintiff's seizures, such as the frequency, nature, and duration of the seizures, based upon the record evidence.

[10] The ALJ thus does not appear to have considered whether Plaintiff's "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, . . . may be an indication that [Plaintiff's] symptoms are a source of

706]  The ALJ appears to place great significance on a medical record from January 18, 2019 which indicates that Plaintiff had "no seizures on [the] higher dose of [L]amictal" [*see* AR 700], but does not acknowledge that Plaintiff testified at the hearing that the relief she experienced from the higher dose of Lamictal was only temporary as later in January she "start[ed] to get . . . seizures" and "really bad" spells.[11]  [AR 61]  Plaintiff further testified that things had "been progressively getting worse" from January 2019 to May 2019 when she testified at the hearing, and that, since January 2019, she was having seizures approximately five times a month and other blank spells.  [AR 60, 62]

Although there are not detailed medical records for this period, the records indicate that Plaintiff had a doctor's visit related to her seizures on March 7, 2019 and her seizure disorder remained an active problem.  [AR 1233-34]  In addition, Plaintiff's husband also submitted a witness statement that is consistent with Plaintiff's testimony that her condition worsened between January and May 2019.[12]  [AR 287-88]  Although the ALJ found that the statement's contention that Plaintiff's condition had worsened was "inconsistent with the longitudinal medical record document[ing] seizure control with medication" [AR 28], the Court finds that conclusion unsupported by substantial evidence for the same reasons discussed above with regard to Plaintiff's own testimony. The ALJ also appears to have discounted Plaintiff's husband's statement, because he indicated that Plaintiff's condition was sensitive to environmental conditions, including

---

distress and may show that they are intense and persistent."   SSR 16-3p, 2016 WL 1119029, at *8.

[11] A December 6, 2018 medical record also indicates that Plaintiff had two seizures after her dosage of Lamictal was increased in November 2018.  [AR 703]

[12] Plaintiff sought to have her husband testify at the hearing, but the ALJ stated that there was insufficient time and requested that Plaintiff's husband instead submit a statement.  [AR 72]

bright/flashing lights, but "the record does not include evidence suggesting the claimant's epilepsy is aggravated by environmental conditions related to light." [AR 27-28] The ALJ was mistaken. An EEG conducted in or around November 2016 "demonstrate[d] generalized epileptiform activity with spike waves and polyspike waves during photic stimulation." [AR 539] Dr. Collier concluded: "Clearly, [Plaintiff] does have a photosensitivity component to her seizures" and it is "highly recommended . . . that [Plaintiff] avoid flashing lights." [AR 540]

"All of this is important context that undermines the ALJ's reasoning, and the ALJ's failure to address these facts . . . amounted to legal error." *Blazquez v. Saul*, No. 1:19-CV-00890-KRS, 2021 WL 124493, at *4 (D.N.M. Jan. 13, 2021). Although "the ALJ need not discuss all of the evidence in the record, [s]he may not ignore evidence that does not support [her] decision, especially when that evidence is 'significantly probative.'" *Debra W.*, 2021 WL 3931938, at *6 (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996)); *see also Bryant v. Comm'r, SSA*, 753 F. App'x 637, 641 (10th Cir. 2018) (finding that ALJ may not "mischaracterize or downplay evidence to support her findings"). Because the ALJ failed to address much of the probative evidence, it is not clear that the ALJ's conclusion that the longitudinal medical record indicates that Plaintiff's seizures were largely controlled with medication, which the ALJ used to discredit Plaintiff's testimony regarding the intensity and persistence of her symptoms, was based upon "*all* of the available evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (emphasis added). Moreover, the ALJ did not acknowledge—let alone explain the discounting of—Plaintiff's testimony regarding the worsening of her symptoms between January 2019 and May 2019 and thus failed

adequately to "explain which of [Plaintiff's] symptoms [the ALJ] found consistent or inconsistent with the evidence."  SSR 16-3p, 2016 WL 1119029, at *8.

Accordingly, the Court concludes the ALJ failed to adequately consider the intensity, persistence, and limiting effects of Plaintiff's symptoms and that this requires reversal of the ALJ's disability determination.  *See, e.g.*, *Jones v. Colvin*, 514 F. App'x 813, 822 (10th Cir. 2013) (reversing and remanding where "many of the reasons the ALJ gave for discounting [the claimant's] credibility [were] not well-supported by the record" and "the ALJ failed to discuss a variety of evidence that supported [the claimant's] allegations of pain"); *Corley ex rel. of C.M.C. v. Comm'r, SSA*, 752 F. App'x 635, 642 (10th Cir. 2018) (reversing and remanding where ALJ failed to consider testimony regarding claimant's symptoms under proper legal standards and failed to provide adequate explanation); *Krueger v. Astrue*, 337 F. App'x 758, 763 (10th Cir. 2009) (finding that "ALJ committed reversible error when he rejected [the claimant's] testimony regarding the symptoms caused by her [impairment]").

## B.     The ALJ's Analysis of the VE's Testimony

Plaintiff also argues that the ALJ erred by relying upon testimony of the VE that conflicted with the DOT in finding that Plaintiff was not disabled.  [#18 at 11-13]  During the disability review hearing, the ALJ posited to the VE a hypothetical individual with the same limitations as those adopted by the ALJ for Plaintiff's RFC and asked whether such an individual could perform work in the regional or national economy.  [AR 77-78]  In response, the VE identified three jobs that such a hypothetical individual could perform—"dishwasher" identified as DOT number 318.687-010, "laundry worker" identified as DOT number 361.684-014, and "assembler of printed circuit boards"

identified as DOT number 726.687-026.  [AR 78-79]  At step five of her decision, the ALJ agreed with the VE's testimony opining that Plaintiff could perform those three occupations.  [AR 29]

According to Plaintiff, the ALJ's step five analysis "is problematic considering the DOT defines job number 318.687-010 as a 'kitchen helper' [as opposed to 'dishwasher'] and describes the job as someone who 'performs any combination of . . . duties to maintain kitchen work areas and restaurant equipment and utensils in clean and orderly condition.'"  [#18 at 12]  But Plaintiff does not identify why the use of the title "dishwasher" instead of "kitchen helper" by both the VE and the ALJ "is problematic." Indeed, as Plaintiff acknowledges, the DOT states that a kitchen helper's "duties . . . include mopping, sweeping, sorting bottles, scraping food, *washing dishes*, polishing silver, wash[ing] and peel[ing] vegetables and load[ing] or unload[ing] trucks."  *Id.* (emphasis added).  Nor does Plaintiff argue that an individual with Plaintiff's RFC cannot perform the duties of a kitchen helper.  As a result, the fact that the ALJ and VE mistakenly referred to the title as "dishwasher" instead of "kitchen helper" does not warrant reversal, as any such error is harmless.[13]  *See Jackson v. Colvin*, No. CIV-12-377-D, 2013 WL 1633286, at *2-3 (W.D. Okla. Apr. 16, 2013) (finding that VE's reference to the wrong DOT job title did not require reversal where the plaintiff had the RFC to perform the DOT position identified); *Blount v. Colvin*, No. 5:13 CV 1709, 2014 WL 4231182, at *9-10 (N.D. Ohio Aug. 21, 2014) (same); *see also Campbell v. Comm'r*

---

[13]  Indeed, several federal courts have likewise referred to DOT position number 318.687-010 as a "dishwasher."  *See*, *e.g.*, *Michael K. v. Saul*, No. 20 C 2696, 2020 WL 7337821, at *3 (N.D. Ill. Dec. 14, 2020); *Mcgarrah v. Colvin*, No. 2:12-cv-2296 AC, 2014 WL 710988, at *9 (E.D. Cal. Feb. 21, 2014); *Davis v. Astrue*, No. ED CV 11-2033 JCG 2012 WL 5878226, at *1 (C.D. Cal. Nov. 20, 2012).

*of Soc. Sec.*, No. 6:18-CV-2189-Orl-MAP, 2019 WL 6463983, at *5 (M.D. Fla. Dec. 2, 2019) (collecting cases for the proposition that an ALJ or VE's reference to the incorrect DOT job number does not warrant reversal where the ALJ or VE cites the correct job title); *Star v. Colvin*, No. 12-CV-201-FHM, 2013 WL 1788581, at *2 (N.D. Okla. Apr. 26, 2013) (finding that VE's reference to the incorrect DOT job number but the correct job title did not constitute reversible error); *Garcia v. Astrue*, No. 10-CV-00153-LTB, 2011 WL 93753, at *3 (D. Colo. Jan. 11, 2011) (same).

### C.    Plaintiff's Request for Remand with an Immediate Award of Benefits

In her prayer for relief, Plaintiff appears to request that the case be remanded to the Commissioner for an immediate award of benefits.  [#18 at 14]  "Outright reversal and remand for immediate award of benefits is appropriate when additional fact finding would serve no useful purpose."  *Sorenson v. Bowen*, 888 F.2d 706, 713 (10th Cir. 1989) (quotation omitted).  Where, as here, "the record on appeal is unclear as to whether the ALJ applied the appropriate standard by considering all the evidence before him, the proper remedy is reversal and remand."  *Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  The Court thus declines Plaintiff's request that the case be remanded with an instruction for an immediate award of benefits.

## IV.    CONCLUSION

Accordingly,   for   the   foregoing   reasons,   the   Court   **REVERSES**   the Commissioner's decision that Plaintiff was not under a disability within the meaning of the SSA from June 24, 2016 through July 12, 2019 and **REMANDS** this matter to the Commissioner for rehearing and reconsideration consistent with this Order.

DATED:  February 25, 2022

BY THE COURT:

s/Scott T. Varholak
United States Magistrate Judge